IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ROBERT J. ARTIS,

                        Plaintiff,                        OPINION AND ORDER

        v.
                                                          20-cv-951-wmc

TIMOTHY LAXTON,

                        Defendant.

---

        *Pro se* plaintiff Robert Artis is incarcerated at the Wisconsin Secure Program Facility ("WSPF").  The court granted Artis leave to proceed in this lawsuit under 42 U.S.C. § 1983, on a claim that a WSPF corrections officer, defendant Timothy Laxton, ignored his complaints of pain associated with kidney stones for multiple hours in violation of his Eighth Amendment rights.  Laxton seeks summary judgment.  (Dkt. #28.)  Because there is no material dispute that Laxton's claimed failure to act did not cause Artis any additional pain or delayed any meaningful care, Laxton cannot be found to have consciously disregarded Artis's serious medical need or caused him injury.  Accordingly, the court will grant Laxton's motion and direct entry of judgment in his favor.

### UNDISPUTED FACTS[1]

        At all relevant times in 2020, plaintiff Robert Artis was incarcerated at WSPF, where defendant Timothy Laxton was working as a correctional sergeant.

---

[1]  Unless otherwise indicated, the following facts are material and undisputed.  The court has drawn these facts from the parties' proposed findings of fact and responses, as well as the underlying record evidence as appropriate, when viewed in a light most favorable to plaintiff.

On weekdays, Health Services Unit ("HSU") staff is at WSPF from 8:00 a.m. to 4:00 p.m.  During these times, inmates with HSU passes are allowed to travel to their appointments without an escort, but on weekends inmates must be escorted to the HSU by staff because there is less security present.

Among many other responsibilities, Sergeant Laxton is authorized to give inmates passes to go to the HSU for their scheduled appointments.  However, Laxton does not have the authority to tell HSU staff that they must see an inmate or when to see an inmate. Rather, Laxton calls the HSU and reports medical-related complaints to HSU staff, and the HSU will decide whether to see the inmate or tell Laxton to direct the inmate to fill out a Health Service Request ("HSR," also referred to as a "blue slip"), which is then reviewed and triaged the following morning by staff.

On Saturday June 27, 2020, Laxton was working his assigned post on second shift, which lasted from 2:00 to 10:00 p.m.  Sometime after 3:30 p.m., Artis complained to Sergeant Laxton over the intercom in his cell about abdominal and lower back pain.  Laxton then notified Nurse Richardson in the HSU of Artis's complaint; a bit later, Artis was escorted to the HSU.

In the HSU, Artis reported to a nurse that he felt sharp pain in his right side that hurt badly.  The nurse took Artis's vital signs, although the parties dispute whether Artis's blood pressure was elevated due to his pain.  The nurse also performed a urinalysis and noted blood in Artis's urine, as well as "Dribbling, Flank pain, Voiding with difficulty." (Tannen Decl. (dkt. #32) ¶ 11; Ex. 1000 (dkt. #32-1) 5.)

At that time, Dr. Tannan was the on-call doctor, and he was aware that a week prior Artis had been seen in the HSU for a suspected kidney stone. Dr. Tannan attests that because a kidney stone generally can pass on its own, it is not considered a medical emergency, although it can cause significant pain. Dr. Tannan further attests that he was not particularly concerned that Artis had trace amount of blood in his urine because of his age (36) and the amount of blood in his urine does not correlate to pain. As a result, Dr. Tannan concluded that Artis had kidney stones, the institution could manage his pain, and Artis's symptoms did not require additional steps. In his affidavit, Dr. Tannan also listed symptoms that would require additional intervention, including cold sweat, nausea, vomiting, difficulty walking or standing, needing to crouch over, low blood pressure or high pulse rate.

Dr. Tannan prescribed Tramadol, 50 mg oral tablet, to be given four times daily as needed for pain control, and Tamsulosin, 0.4 mg daily for two weeks or until the stone passed. Tramadol is an opiate used to treat moderate to severe pain, and Tamsulosin is a medication commonly used to give the stone more room to pass. Dr. Tannan advised Artis to drink fluids and directed that he be seen for follow-up two days later. The nurse provided Artis the Tramadol, but not the Tamsulosin because the HSU did not have that medication in stock at that time.

At around 5:30 p.m., after returning to his unit, Artis's pain worsened, and he continued urinating blood. Artis repeatedly pressed his intercom, asking Sergeant Laxton to call the HSU and tell them that his pain worsened and he was urinating blood. The parties dispute *how* Laxton handled Artis's continued complaints. Laxton attests that after

3

Artis used his intercom the second time, he called the HSU, and Nurse Richardson responded that they had already called the on-call doctor, who provided medication and there was nothing else they could do for him.  Laxton says that he reported this information back to Artis, which Artis disputes.  Regardless, Laxton says that Artis next asked to speak with a supervisor, so he called Captain Primmer and reported Artis's pain complaints, who responded that he had heard about Artis's complaints.

In contrast, Artis maintains that Sergeant Laxton did not call the HSU at all, and that Laxton actually responded to his intercom complaints by stating that everyone in the HSU had left.  Artis also attests that Laxton repeatedly responded "no" to his requests for help based on worsening pain; and when he asked Laxton to call a supervisor, Artis attests that Laxton responded that a supervisor could not "do shit" for him.  (Artis Decl. (dkt. #37) ¶ 7.)

At about 6:50 p.m., Laxton did release Artis from his cell so he could attend his scheduled law library time.  Video footage further shows Artis walking down the hallway outside his unit about this time, his stopping in the sergeant's area for about four minutes, and then walking the length of the hallway and out of view.  (Ex. 1002, at 6:52:12-6:57:12.)  Artis's gait and body language shown in the video footage does not suggest severe pain or difficulty moving.  Moreover, according to Laxton, when Artis was at the sergeant's station, he told Laxton that he was still in pain and wanted to go back on a medication he had been prescribed two weeks earlier.  However, Artis says that he only told Laxton that he was urinating blood and asked him to call a supervisor, which Laxton again refused.

Regardless, Sergeant Laxton did not believe that Artis was in severe pain at that time; he did not see him grimacing in pain or grabbing his stomach, back or side; and Artis was able to speak for several minutes. So, Laxton explains, he merely responded to Artis by explaining that he had already made the HSU and Primmer aware of the situation, which Artis also disputes. Indeed, Artis and another inmate both attest that Laxton instead told him to start doing jumping jacks and laughed at Artis as he walked away. (Artis Decl. (dkt. #37); Johnson Decl. (dkt. #39) ¶ 5.) Artis further states that he told Laxton that he was going to do something drastic to get help. Finally, Artis claims that after going back to his cell, he continued to press the intercom and ask Laxton to call someone to help him, but Laxton still responded "no."

At about 7:15 p.m., two inmates next told Laxton that they had just watched Artis swallow many pills. Laxton immediately told other officers and went to Artis's cell. Artis told them that he had swallowed 75 pills, so Laxton contacted Captain Primmer. Artis was moved out of his cell and monitored while they waited for Primmer to arrive, since Sergeant Laxton did not have the authority to decide the next step to respond to Artis's claimed ingestion of the pills. At about 7:53 p.m. Artis was transported to a nearby emergency room for assessment and treatment. The emergency room providers did not provide any pain relief medication to Artis, but they did give Artis Tamsulosin to help pass the kidney stone, something Dr. Tannan had already prescribed.

Sergeant Laxton had no further interactions with Artis. At the hospital Artis was treated for an overdose, although the emergency room staff concluded that his labs showed that he was not at risk. (Ex. 1000 (dkt. #32-1) 37.) After that incident, Artis claims to

have experienced pain from the kidney stones for another three months, for which he continued to receive multiple medications, including Tramadol and Tamsulosin.

OPINION

Summary judgment must be granted against a party who fails to make a showing sufficient to establish the existence of an essential element on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If there is any genuine issue as to any material fact, the court cannot grant summary judgment. *Id.* A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). Finally, "[t]he evidence of the non-movant[s] is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Id.* at 255.

The Eighth Amendment recognizes a prisoner's right to receive adequate medical care, *Estelle v. Gamble*, 429 U.S. 97 (1976), which includes a right to appropriate mental health treatment. *Rice ex. Rel. Rice v. Correctional Medical Servs.*, 675 F.3d 650, 665 (7th Cir. 2012). To prevail on a claim of constitutionally inadequate medical care, an inmate must demonstrate two elements: (1) an objectively serious medical condition; and (2) a state official who was deliberately (that is, subjectively) indifferent. *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). A medical need is "serious" if it: so obviously requires treatment that even a lay person could recognize the need for medical attention; carries risk of permanent serious impairment if left untreated; results in needless pain and suffering; *or* significantly affects an individual's

daily activities. *Gutierrez v. Peters*, 111 F.3d 1364, 1371-73 (7th Cir. 1997). "Deliberate indifference" is a high standard, requiring proof that the official was aware that the prisoner faced a substantial risk of serious harm but disregarded that risk by consciously failing to take reasonable measures to address it. *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997). Thus, an act of deliberate indifference requires *more than* negligence, or even gross negligence, but something less than *purposeful* acts. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).

Defendant seeks summary judgment because it is undisputed that he reached out to both the HSU and his supervisor about Artis's ongoing concerns, and he appropriately deferred to the medical professionals and his supervisor about how to handle his complaints. In opposition, Artis points to his version of the facts, arguing that Laxton's persistence in refusing to call the HSU or his supervisor to report his continuing and worsening pain would allow a reasonable jury to infer a conscious disregard for his serious medical condition. Even taking Artis's version of their exchanges as true, Laxton argues he is still entitled to summary judgment because there is no dispute that Laxton reached out to the appropriate staff and was told that there was nothing more to be done for Artis's pain that night; and in any event, Artis did not receive additional pain medication when he went to the emergency room.

To begin, there is no dispute that plaintiff Artis complained to Sergeant Laxton, and that Laxton did not demand that someone from the HSU examine him or send him to the emergency room until Artis reported overdosing. However, Laxton is not a medical professional, so he was entitled to defer to the judgment of the medical professionals

treating Artis, *unless* it was obvious that the treatment approach would worsen Artis's condition or leave him in unnecessary pain.  *McGee v. Adams*, 721 F.3d 474, 483 (7th Cir. 2013); *see also Dobbey v. Mitchell-Lawshea*, 806 F.3d 938, 941 (7th Cir. 2015) ("If a prisoner is writhing in agony, the guard cannot ignore him on the ground of not being a doctor; he has to make an effort to find a doctor, or . . . some medical professional.").

Here, Laxton did not simply *ignore* Artis's complaints.  Indeed, by the time Artis first interacted with Laxton, Artis had just been to the HSU, where he received a Tramadol for pain.  In response to Artis's continued complaints, Laxton further attests that he called the HSU and spoke with a nurse, who told him that the recommendation from the on-call doctor – to provide Artis the medication and have a follow-up the following Monday – was the only intervention available.  Laxton also attests to calling Captain Primmer, who did not direct him to take any different action.

Artis insists that Laxton made no such calls. Rather, he claims Laxton said that no one was in the HSU, and his supervisor would not "do shit" for him.  However, Artis's speculation that Laxton did not make any calls is not personal knowledge of Laxton's actions.  Moreover, Laxton responding that no one could do anything is not necessarily inconsistent with Laxton having called the HSU or Primmer and being told by both that there was nothing more to be done about Artis's pain at that time.

Artis also maintains that Laxton laughed at him and told him to do jumping jacks to address the kidney stones.  However, rudeness or inappropriate comments are not the central inquiry with respect to Artis's claim; Laxton's *actions* are what matter most.  *See Qian v. Kautz,* 168 F.3d 949, 955 (7th Cir. 1999) ("deliberate indifference" is "simply a

synonym for intentional or reckless conduct"); *Antoine v. Uchtman*, 275 F. App'x 539, 541 (7th Cir. 2008) ("[T]he Constitution does not compel guards to address prisoners in a civil tone using polite language").  Moreover, Sergeant Laxton's impression was that Artis did not present to him in such pain that he should have questioned the nurse's decision that Artis did not require further intervention that evening.

Indeed, the record supports that conclusion.  There is no dispute that Artis was able to walk to the law library and interacted with Laxton for multiple minutes.  The video footage does not suggest that Artis was in extreme pain or could not function.

More importantly, even assuming a reasonable jury could infer Laxton did *not* actually call the HSU or his supervisor and instead delayed sending Artis back to the HSU, the question becomes whether the evidence of record shows that Laxton's failure to act sooner worsened Artis's condition or caused him unnecessary pain.[2]  *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019) (requiring that a plaintiff submit "verifying medical evidence that the delay, and not the underlying condition, caused some harm") (quotation marks and citation omitted).  Artis received medical attention about 90 minutes after he started complaining to Laxton.  Artis had been in significant pain when he saw the nurse and when Dr. Tannan prescribed the Tramadol and Tamsulosin.  Even assuming that he remained at that level of pain, despite receiving the Tramadol, Artis did not receive any *more* pain medication after he was taken to the emergency room to address his overdose.  And Artis does not state that when he received the Tamsulosin, that

---

[2]  There is no suggestion that Laxton knew that Artis would commit self-harm, and the court did not grant him leave to proceed on an Eighth Amendment claim arising from his claimed overdose.

medication helped to alleviate any of his pain.  Indeed, Artis claims his pain continued for months afterward.

"Even when jail staff respond unreasonably" to a serious medical condition, a plaintiff "must prove that their conduct caused harm." *Redman v. Downs*, 854 F. App'x 736, 739, 2021 WL 1889749 (7th Cir. 2021).  Artis says that he continued to receive pain medications and Tamsulosin over the next few months, while his kidney stones only resolved with time and ongoing pain.  Thus, no reasonable jury could find that anything Sergeant Laxton did or did not do caused his pain to worsen, or made the resolution of Artis's kidney stones more challenging.  Therefore, no reasonable fact finder could conclude that Laxton *caused* Artis's continued pain or unnecessarily delayed providing him needed medical attention to address that pain.  Accordingly, the court will grant Laxton's motion and direct entry of final judgment in his favor.

ORDER

IT IS ORDERED that:

1.  Defendant's motion for summary judgment (dkt. #28) is GRANTED.

2.  The clerk of court is directed to enter judgment accordingly and close this case.

Entered this 4th day of April, 2023.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge